In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-11-00073-CR

                                                ______________________________

 

 

                                 RAY CHARLES HAWKINS,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 114th
Judicial District Court

                                                             Smith County, Texas

                                                          Trial Court
No. 4-93-821

 

                                                       
                                           

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            During jury
selection in Ray Charles Hawkins’ Smith County[1]
trial for indecency with a child, Hawkins’ counsel made two Batson[2]
challenges, both of which were overruled by the trial court and which are the
basis for Hawkins’ appeal.  Hawkins was
ultimately convicted and sentenced to twenty years’ incarceration.[3]  We affirm the judgment of the trial court,
because (1) the State proffered manifestly race-neutral explanations for
its strikes, and (2) the trial court did not clearly err in accepting those
explanations.

            Hawkins’
Batson challenges questioned the
State’s peremptory strikes of two African-American veniremembers.[4]  The trial court, without expressly finding
Hawkins established a prima facie showing of racial discrimination, heard
testimony from the State regarding its use of peremptory strikes on the two African-American
veniremembers.  At the conclusion of the
hearing, the trial court overruled the Batson
challenges, finding the State expressed race-neutral reasons for the exercises
of its peremptory strikes.  On appeal,
Hawkins contends the State’s reasons for the exercise of the peremptory strikes
were a pretext for discrimination.

            The State’s
purposeful use of peremptory strikes in a racially discriminatory manner
violates the Equal Protection Clause of the Fourteenth Amendment to the United
States Constitution.  Batson, 476 U.S. at 89.  The United States Supreme Court has outlined
a three-step process for evaluating claims that the State has exercised
peremptory challenges in a manner violating the Equal Protection Clause.  Hernandez
v. New York, 500 U.S. 352, 358 (1991); Batson,
476 U.S. at 96–98.  The defendant must
first make a prima facie showing that the State has exercised peremptory
challenges on the basis of race.  Hernandez, 500 U.S. at 358.  When this showing is made, the burden then
shifts to the State to articulate a race-neutral explanation for striking the
juror in question.  Id. at 358–59; see also
Miller-El v. Cockrell, 537 U.S. 322, 328 (2003).  In light of this information, the trial court
must then determine whether the defendant has shown purposeful
discrimination.  Miller-El, 537 U.S. at 328–29.

            We should
review a Batson claim

 

by an examination of the record in the light
most favorable to the ruling of the trial court.  The standard of review is whether the ruling
of the trial court was or was not “clearly erroneous.”  If supported by the record, including the voir
dire, the prosecutor’s explanation of his use of a peremptory challenge, the
rebuttal by appellant and impeaching evidence, the decision of the trial court
will not be clearly erroneous.

 

Camacho v. State, 864 S.W.2d 524, 528 (Tex. Crim. App. 1993)
(citations omitted).  To determine
whether the trial court’s ruling was clearly erroneous, we examine the record
to determine whether the ruling leaves us with a “definite and firm conviction
that a mistake has been committed.”  Guzman v. State, 85 S.W.3d 242, 254
(Tex. Crim. App. 2002).  The trial
court’s decision on the issue of pretext is solely a question of fact.  Gibson
v. State, 144 S.W.2d 530, 534 (Tex. Crim. App. 2004).  The trial court is therefore in the best
position to make that credibility determination.  Id.

The trial court’s ruling in the third step must
be sustained on appeal unless it is clearly erroneous.  Because the trial court’s ruling requires an
evaluation of the credibility and demeanor of prosecutors and venire members,
and because this evaluation lies peculiarly within the trial court’s province,
we defer to the trial court in the absence of exceptional circumstances.

 

Grant v. State,
325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citations omitted).

 

(1)        The State Proffered Manifestly
Race-Neutral Explanations for Its Strikes

 

            The first of the two veniremembers—who were struck by
the State and whose removal has been challenged by Hawkins—was Vickie
Washington.  Counsel for the State
testified that Washington was struck from the panel because “she felt some
discomfort with racism involving police in Smith County,” and believed some
police officers acted on racism in Smith County.  The State’s attorney further testified that
Washington was struck because, though listed as a possible witness in an
indecency-with-a-child case, she failed to raise her hand when asked on voir
dire whether she had knowledge of any similar cases.  In addition, Washington hesitated to answer
the State’s question regarding law enforcement and prejudice during the State’s
voir dire:

With regard to Number 20, as a parole officer,
she was very hesitant and very concerned about the race, and she wouldn’t even
-- she hesitated to answer my question.[5]

 

I even commented upon that, because there --
there is a concern that they are affected by it in a way that would be adverse
to my position before I even get a shot to do it.

 

            In denying
the Batson challenge to Washington,
the trial court found

 

[T]hat the State has expressed race-neutral
reasons, specifically the hesitance to answer, her lack of forthrightness, her --
the tendency of a parole officer to be geared toward rehabilitation rather than
punishment, which is often what the State is looking for, and then really her
lack of a square answer with regard to the prejudice question.

 

The Court does find those are race-neutral
reasons and denies the challenge under Batson
as to Juror Number 20.

 

            The State
articulated race-neutral reasons for striking Washington.  See
Purkett v. Elem, 514 U.S. 765, 768 (1995) (unless discriminatory intent
inherent in prosecutor’s explanation, offered reason deemed race neutral); see also Williams v. State, 301 S.W.3d 675, 689 (Tex. Crim. App. 2009)
(veniremember “never would quite answer the question”).  Striking a potential juror for being hesitant
in answering questions during voir dire is a valid, race-neutral
explanation.  See Kennerson v. State,
984 S.W.2d 705, 708 (Tex. App.—Houston [1st Dist.] 1998, pet. ref’d).

            The
proponent of the strike need only tender a facially race-neutral reason for the
strike.  The ultimate plausibility of
that explanation is to be considered as part of the third step, in which the
court determines whether the opponent of the strike has satisfied the burden of
persuasion to establish by a preponderance of the evidence that the strike was
the product of the proponent’s purposeful discrimination.  Watkins v. State, 245 S.W.3d 444, 447
(Tex. Crim. App. 2008).

            Here,
Hawkins claims the State’s explanation of concern about Washington’s views of
Smith County law enforcement as prejudiced or racist is merely a pretext for
discrimination.  This concern, Hawkins
maintains, could have easily been resolved by further questioning of
Washington, and the failure to do so exposes the weakness of the State’s
explanation.  See Chambers v. State, 866 S.W.2d 9, 24–25 (Tex. Crim. App. 1993)
(lack of questioning might expose weakness of State’s explanation).  Even so, “the State is not required to ask a
specified rubric of questions.”  Id. at 24.

            The
State suspected that Washington would not be a good juror because she hesitated
in responding to questions, expressed concerns regarding prejudice by law
enforcement, demonstrated a lack of candor, and, because she was a parole
officer, she might be geared toward rehabilitation rather than punishment.  Under these circumstances, Hawkins has failed
to demonstrate that the State’s explanation of Washington’s hesitancy in
responding to questions and concern about race did not constitute manifestly
race-neutral explanations for striking Washington.  Hawkins also has not attempted to demonstrate
how the State’s concern regarding a lack of candor[6]
and Washington’s employment as a parole officer[7]
are not race-neutral explanations for striking Washington.  See Middleton
v. State, 187 S.W.3d 134, 142 (Tex. App.—Texarkana 2006, no pet.)
(veniremember’s employment is race-neutral explanation, if State has had poor
success with that type worker).  The
State provided race-neutral explanations for its peremptory strike against
Washington, none of which were indicative of purposeful discrimination.

            The second
veniremember in question was Ralph Thompson. 
Counsel for the State testified that Thompson was struck because he had
been previously convicted for assault and driving while intoxicated.  The State further indicated Thompson was
struck because he believed Smith County law enforcement was prejudiced.[8]  In overruling Hawkins’ Batson challenge, the trial court found Thompson’s prior
convictions (although Thompson was not asked about them) to be a race-neutral
reason for the exercise of the peremptory strike.  See
Partida v. State, 133 S.W.3d 738, 742
(Tex. App.—Corpus Christi 2003, no pet.) (criminal history is race-neutral
reason for striking from panel).

            The
questioning of Thompson failed to indicate, however, that Thompson believed
Smith County law enforcement was prejudiced—one of the reasons given by the
State for the exercise of a peremptory challenge against Thompson.  To the contrary, Thompson’s responses
reflected his belief that Smith County law enforcement officers are “good” and
do their jobs well.  While this isolated
explanation is factually inaccurate, the State provided a verifiable, race-neutral
explanation for its use of a peremptory strike against Thompson, and the trial
court overruled Hawkins’ Batson
challenge based solely on the race-neutral explanation, as described in the
preceding paragraph of this opinion.  The
trial court, thus, did not err in finding the State satisfied its burden of
production to provide race-neutral explanations for its peremptory
strikes.  We next turn to step three of
the analysis and examine the plausibility of those race-neutral explanations.

(2)        The Trial Court Did Not Clearly Err in
Accepting the State’s Race-Neutral Explanations    for Its Strikes

 

            Hawkins
asserts that prejudice in the exercise of the State’s peremptory challenges is
evidenced by the line of questioning regarding the issue of racism and prejudice.  Initially, Washington was questioned
regarding her views on the issue of whether Smith County law enforcement was
racially prejudiced.  Immediately after
Washington was questioned on this issue, the State turned to Thompson, who
claimed no problem in that area.[9]  Next, the State questioned veniremember
thirty-one (an African-American later struck for cause) regarding his views on
race relations and law enforcement.[10]  The State then questioned veniremember
thirty-eight, the only remaining African-American in the strike zone,[11]
and asked the same types of questions.[12]


            Hawkins
complains that the State struck two of the three remaining African-Americans in
the strike zone (the fourth having been struck for cause).  Moreover, the only persons the State
questioned regarding racism or prejudice were the African-American members of
the panel.[13]  Essentially, Hawkins claims the State used
its peremptory challenges at a disproportionate rate to strike African-American
veniremembers[14] and further
directed questions designed to set up peremptory challenges at a
disproportionate rate to African-American veniremembers.

            Certainly,
this strategy by the State—questioning only minority veniremembers on whether
they viewed Smith County law enforcement as prejudiced—is certain to raise
eyebrows and put the State in a vulnerable position in trying to defend against
this Batson challenge.  The trial court could have justifiably found
a pretext based on this selective questioning, given the situation
presented.  But it did not so find.  Our job is not to rule based on what we would
have found, had we been in the trial court’s position, but to determine whether
the trial court’s ruling was clearly erroneous. 
Grant, 325 S.W.3d at 657.

            Similar
concerns were addressed in Watkins v.
State, 245 S.W.3d 444 (Tex. Crim. App. 2008).  In that case, of the first thirty-seven
veniremembers, eight were African-American. 
The State used six of its eleven peremptory challenges to exclude seven
of the eight African-Americans from the jury pool.  Id.
at 451.  Faced with disproportionate use
of peremptory challenges, the court recognized: 

[T]his factor [the disproportionate use of
peremptory challenges] does not alone establish that the trial court’s
conclusion, that the State’s explanations were not pretextual, is clearly
erroneous.  In Miller-El,[15]
it was the combined weight of all the factors suggesting pretext that
ultimately convinced the Supreme Court that the deference ordinarily accorded
to the state court’s judgment was inappropriate.  Similarly, a reviewing court should look to
all relevant factors in deciding whether the trial court’s finding was clearly erroneous.

 

Id. at 452.

 

            Watkins also involved the issue of
disparate questioning.  The State
questioned African-American veniremembers about their ability to convict based
on circumstantial evidence at twice the rate one would expect from a random
selection.  Id.  The court concluded, however,
that, while one of the State’s main lines of questioning “seemed suspiciously
directed toward African-Americans, the two others manifestly were not.”  Id.
at 453.  While disparate questioning was
some evidence “that would support a finding that the prosecutor’s explanations
were pretextual, the trial court found no pretext.  Nor can we say that this evidence, at least
by itself, compels a conclusion that the trial court clearly erred.”  Id.

            Here, the State’s questioning of only
African-American veniremembers about their opinion of racial prejudice among
Smith County law enforcement—which one might suppose is predominantly Caucasion—is
evidence the State directed questions designed to set up peremptory challenges
at a disproportionate rate to African-American veniremembers.  As in Watkins,
the State’s remaining areas of questioning were not “suspiciously directed
toward African-Americans.”[16]

            The State’s
use of peremptory challenges against two of the three remaining
African-Americans in the strike zone is disproportionate.

            But,
neither of these factors, standing alone, can support the conclusion that the
trial court erroneously determined that the State’s explanations for the
exercise of its peremptory challenges were not pretextual.  Id.
at 451, 453.  The question becomes, then,
one of whether these two factors, when combined, compel the conclusion that the
trial court erred in finding a lack of pretext for the State’s race-neutral
explanations for its peremptory challenges to Washington and Thompson.  We conclude they do not.

            In Watkins, the court acknowledged “there
was evidence in the record from which a rational judge could have concluded
that the State’s race-neutral explanations for peremptory challenges . . . were
but a pretext for race-based exclusion.”[17]  Id.
at 456.  The court recognized, however,
that

this is not a case, like Miller–El, in which every relevant
factor firmly supports a conclusion of pretext.  The prosecutor’s explanations for why he
peremptorily struck Berry and Davis were manifestly race-neutral.  It was the appellant’s ultimate burden to
persuade the trial court that those explanations were incredible or
disingenuous.  The State struck other,
non-African-American veniremen for the same reason that it struck Berry.  And it is apparent that Davis was struck
because she gave an answer that was different from, and more objectionable to
the State than, the answers it received from non-African-Americans to the same
line of questioning.  Thus, the record
also supports a conclusion that the State’s race-neutral explanations were not
a pretext.

 

Id. at 457.  Further,

 

In Miller–El v. Dretke, the Supreme Court treated the
question of pretext as a question of fact. 
We also regard it as a fact question, for the trial court to resolve,
subject to reversal on appeal only for clear error.  Because the record supports the trial
court’s resolution of this fact question, we cannot say that it clearly erred,
even though the record might support an opposite resolution as well.

 

Id. (citations
omitted).

 

            In this case, as
in Watkins, the State provided
manifestly race-neutral explanations for its use of peremptory strikes against
Washington and Thompson.  It was Hawkins’
burden to persuade the trial court that those explanations were “incredible or
disingenuous.”  See id.  Hawkins does not argue, and did not present
evidence at the Batson hearing, that
the State engaged in disparate treatment by failing to strike similarly
situated white veniremembers with criminal histories, who expressed hesitancy
in answering questions, who were employed as parole officers, or who had
previously served as a witness (or possible witness) at a criminal trial
involving a similar type of offense. 
And, while it is true that some evidence at voir dire could support an
inference of pretext, the question of pretext is one of fact.  Id.  Because the record supports the trial court’s
resolution of this fact question, we cannot say the decision of the trial court
is clearly erroneous.

            We affirm
the judgment of the trial court. 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          January
10, 2012         

Date Decided:             January
25, 2012

 

Do Not Publish











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.  See Tex. Gov’t Code Ann.
§ 73.001 (West 2005).  We are unaware of
any conflict between precedent of the Twelfth Court of Appeals and that of this
Court on any relevant issue.  See Tex.
R. App. P. 41.3.

 





[2]See Batson v. Kentucky, 476 U.S. 79
(1986).

 





[3]The
alleged offense occurred in 1992, and Hawkins was initially convicted of
indecency with a child and sentenced to twenty years’ imprisonment in
1993.  After Hawkins’ initial appeal was
dismissed as not timely filed, he was granted an out-of-time appeal.  That appeal was likewise dismissed due to a
lack of certification of right to appeal. 
After Hawkins was granted a second out-of-time appeal, the Court of
Appeals for the Twelfth District reversed the judgment of the trial court and
remanded to the trial court for a new trial. 
This trial resulted in the judgment from which Hawkins now appeals.

 





[4]Hawkins
challenged the State’s peremptory strikes on juror numbers twenty and
twenty-four.  

 





[5]This
testimony concerns the following exchange between Washington and counsel for
the State:

 

                                [STATE]:               Is there any problem, from a
racial standpoint, with the police -- or any – any kind of law enforcement in
the Smith County area?

 

                                WASHINGTON:  Well, I don’t know how to answer it.

 

                                [STATE]:               It’s a hard question.

 

                                WASHINGTON:
It’s very hard.

 

                                [STATE]:               Yes.

 

                                WASHINGTON:  Because you see a whole lot of different
things.

 

                                [STATE]:               Yes, ma’am, you do.

 

                                WASHINGTON:  A lot.

 

                                                .
. . . 

 

                                [STATE]:               . . . And you hesitated, see, and
you -- you know, it’s like the longer you hesitate, the more I realize you have
some discomfort about that; fair to say?

 

                                WASHINGTON:  Yes, it is.

 

 





[6]Counsel
for Hawkins testified that Washington did not disclose her previous service as
a witness in an unrelated indecency trial when asked during voir dire:

 

Anybody worried
about the time or anybody on this side that either was a victim or knows a
victim of some kind of sexual crime?  Put
it that way.

 

Either a close
family member or a close personal friend, anybody that has any of that in their
background?  

 





[7]During
the State’s voir dire, Washington indicated that she worked as a parole officer
for almost ten years.  One of the State’s
explanations for striking Washington was based on her employment.  Counsel stated,

 

We also talked about the
parole officer and the corrections officer. 
We look -- I personally look at those, no matter what their color, very
closely all the time because of experiences I’ve had throughout my career with
people who begin to -- to identify, and, in fact, some even begin to associate
with the people that [they] are supervising, and we concern ourselves with
that.

 

 





[8]The
exchange with Thompson (veniremember number twenty-four) prompting the
peremptory challenge follows:

 

                                [STATE]:               Have you ever had a bad
experience with a police officer?

 

                                THOMPSON:       Getting stopped for no reason.

 

                                                .
. . .

 

                                [STATE]:               Is there anything about those
experiences that would cause you a problem with a                 police officer around here?

 

                                THOMPSON:       No.

 

                                                .
. . .

 

                                [STATE]:               Give me an assessment.  Police officers in Smith County, general
assessment, good or bad?

 

                                THOMPSON:       Good.

 

                                [STATE]:               They do their -- they do their
jobs and do them well?

 

                                THOMPSON:       Yes, sir.

 

                                [STATE]:               Okay.  Just because of that, are you going to
automatically believe them?

 

                                THOMPSON:       No.

 

                                [STATE]:               Are you going to automatically disbelieve
them?

 

                                THOMPSON:       No.

 





[9]When
asked if he perceived any problem “with the law enforcement people of Smith
County with regard to racial issues,” Thompson replied that he perceived no
such problem.  

 





[10]This
veniremember indicated he believes there is some degree of racial prejudice in
Smith County law enforcement.  

 





[11]The
trial court noted for the record that those African-American veniremembers
within the strike zone were numbers twenty, twenty-four, thirty-one, and
thirty-eight.  There was one additional
African-American on the panel, outside the strike zone.  

 





[12]Veniremember
thirty-eight indicated he believes Smith County law enforcement engages in
racial stereotyping.  

 





[13]Counsel
for the State testified that, after reviewing his voir dire notes, he did not
believe other veniremembers were asked about racism in Smith County.  Our review of the record reveals that only
the four African-American veniremembers in the strike zone were asked about
prejudice or racism in Smith County law enforcement.

 





[14]Although
the record does not reflect the number of strikes utilized on veniremembers
other than African-Americans, we presume, based on Hawkins’ argument and the
State’s response, that the remainder of the State’s strikes was used on
non-African-American veniremembers.

 





[15]The
Miller-El factors included (1) the
use of peremptory challenges to eliminate a far greater proportion of
African-American veniremembers than non-African-American veniremembers, (2) the
reasons asserted for eliminating two African-American veniremembers appeared to
apply equally well to many of the non-African-American veniremembers who were
not challenged, (3) utilization by the State of the option to shuffle the jury
panel in a manner that supported an inference of race discrimination, (4)
utilization of questioning specifically designed to elicit grounds for
peremptory challenges disproportionately, in a manner that suggested an intent
to single out African-American veniremembers for elimination, and (5) that the
county in which Miller-El was
prosecuted followed a formal policy to exclude minorities from jury service.  Miller-El
v. Dretke, 545 U.S. 231, 240–63
(2005). The cumulative impact of these none-exclusive factors caused the United
States Supreme Court to conclude that “its direction is too powerful to
conclude anything but discrimination.”  Id. at 265.

 





[16]The
State engaged in five primary lines of questioning, including judging the
credibility of witnesses, the panel’s experience with law enforcement, the
length of time between the offense and trial, whether the veniremembers have
been or know someone who has been a crime victim, and the State’s burden of
proof in general and in light of certain categories of evidence.  In questioning the panel regarding its
experiences with law enforcement, the State turned to the issue of racism and
prejudice.  Only veniremembers twenty, twenty-four,
thirty-one, and thirty-eight (all African-American) were called on individually
for their assessment of prejudice in Smith County law enforcement.  

 





[17]The
court elaborated:

 

The numbers
support the appellant. The State exercised its peremptory challenges against African–American
veniremen at a grossly disproportionate rate as compared to
non-African-Americans.  This fact serves
not only to establish the appellant’s prima facie case of racial discrimination
(if that were needed in this case), but also as evidence in support of his
ultimate burden of persuasion.  Moreover,
the prosecutor directed at least one line of questioning designed to ferret out
objectionable jurors toward African–American veniremen at twice the rate one
would expect from random selection.  The
trial court may (or may not) have found that the prosecutor’s motive in
peremptorily striking another African–American prospective juror was racial.  These facts militate in favor of a finding of
pretext, and would have supported a trial court’s ruling to that effect.  

 

Id. at 456–57.